LOUIS SAFRANSKI v. MARGARET SAFRANSKI.[1]

October 25, 1946.

No. 34,230.

---

[1] Reported in 24 N. W. (2d) 834.

*Andrew Horkey,* for appellant.
*Arthur A. Logefeil,* for respondent.

THOMAS GALLAGHER, JUSTICE.

This is an action brought by Louis Safranski, as plaintiff, against his wife, Margaret Safranski, defendant, for divorce on the ground of desertion. Defendant interposed a counterclaim, seeking a divorce on the ground of cruel and inhuman treatment. The trial court made findings and ordered judgment awarding defendant a divorce and the permanent care and custody of the minor child of the parties and directing plaintiff to pay defendant for the support and maintenance of herself and said child the sum of $60 per month.

Subsequent to the entry of the judgment, plaintiff moved for amended findings or, in the alternative, for a new trial. From the order denying his motion, this appeal is taken.

Plaintiff presents for determination here the sole question whether an alleged oral antenuptial agreement between him and defendant, whereunder their marriage was undertaken for the sole purpose of preventing their child from being born illegitimately, should be specifically enforced in this action and should relieve him from the obligation of paying support money to defendant. Plaintiff does not question his obligation in this respect insofar as the child is concerned.

The record discloses that this issue was not presented for determination at the trial. It was not covered by the pleadings or tried by consent of the parties. No reference was made to it throughout the trial.

To sustain the alleged antenuptial agreement, plaintiff relies upon the following testimony:

By plaintiff:

"Q. Now, this marriage, how did it come about?

"A. Well, she told me that she was pregnant, and asked me many times what we were going to do about it. She told me that

I am to blame that she is that way, that she is pregnant. Well, she had been asking me several times, 'What are you going to do about it?' and I said, 'I don't know.' So we went to Mrs. Woodland's [a friend] residence.

\* \* \* \* \*

"Q. What happened there?

"A. They were telling me I should marry her.

"Q. Who was telling you that?

"A. Mrs. Woodland and Mrs. Shrewsbury [a friend], to give the child a name, and that I could divorce her afterwards.

"Q. Who said you could divorce her?

"A. Mrs. Woodland and Mrs. Shrewsbury.

\* \* \* \* \*

"Q. What did Margaret [defendant] say?

"A. She agreed to that.

"Q. What did she say? Don't say what she agreed to.

"A. She said—I don't remember exactly what she did say. \* \* \* She said she wanted to marry me. She said that she would give me a divorce afterwards if I want it. That is what she said there.

"Q. Was anything said about the child?

"A. Well, that would give the child a name. She claimed I am to blame for that case.

"Q. You married her to give the child your name, is that right?

"A. Yes.

"Q. Did she make any threats against you?

"A. Yes; she said if I don't marry her, she is going to report me to the court, and she said that she is going to make it miserable for me, if I don't marry her."

By defendant:

"Q. Didn't you get married because you were in a family way, to give the child a name?

"A. I think at the time, yes.

\* \* \* \* \*

"Q. And that is why you got married to him, to give the child a name?

"A. Not necessarily. It was his duty to marry me; it was his child.

"Q. Well, that was the only reason you got married, was it not?

"A. Yes, it was.

"Q. To save this child from being an illegitimate child?

"A. Yes.

\* \* \* \* \*

"Q. After you learned that you were pregnant, did you ever have a talk with the plaintiff wherein you asked him to marry you, merely to give the child a name?

"A. I did not."

The evidence further disclosed that for some time prior to the marriage defendant had been acting as housekeeper for plaintiff; that they became engaged in 1936, at which time plaintiff gave her a diamond engagement ring; that at that time they talked of getting married, but decided to wait because plaintiff's children by a former marriage were too young.

On the issue of this marriage and the child of the parties, the trial court in its findings merely determined:

"That on the 26th day of June 1943, at the city of Minneapolis in the county of Hennepin and state of Minnesota, plaintiff and defendant were married and ever since have been and still are husband and wife.

\* \* \* \* \*

"That plaintiff is the father of Richard Dennis Safranski, born during wedlock on September 21, 1943; \* \* \*."

■ We have no choice but to affirm the trial court's findings in the above respect. This may be done on any one of several grounds. First, it is obvious that any issue relative to the alleged oral antenuptial agreement is not properly before this court at this time. The record clearly indicates that this issue was not in litigation before the trial court and was not determined by it. It is well established that only issues raised by the pleadings or otherwise

litigated by consent of the parties at the trial may properly be considered here. 1 Dunnell, Dig. & Supp. § 384.

■ Further, it is clear that the evidence above outlined amply sustains the trial court's finding that the parties hereto were duly and legally married under the laws of this state and that the usual obligations attendant upon any such marriage immediately followed. It is to be noted that defendant specifically denied any such antenuptial agreement, and the trial court was justified in believing her testimony and basing its findings thereon. Under such circumstances, we have no choice except to affirm the same.

■ It should be further mentioned that, even had the parties entered into the antenuptial agreement alleged by plaintiff, it is doubtful if the same would have been effective. Obviously, such an agreement is directly contrary to sound public policy. Marriage is a civil contract which differs from other contracts in that it cannot be dissolved by the parties themselves but only by the judgment of a competent court. The marriage contract creates a status or relationship which carries responsibilities and duties which the parties may not by mutual agreement terminate or otherwise avoid. Amongst the obligations imposed thereby is the obligation of the husband to care for and support his wife, to provide a home for her, and to maintain, support, educate, and provide a home for any children born of such marriage. To permit parties to such a contract to secretly agree that only a limited portion of the above obligations will follow marriage would be contrary to sound public policy and a fraud upon the state. 35 Am. Jur., Marriage, § 39; Annotation, 70 A. L. R. 827.

The judgment of the trial court must be affirmed.

Defendant is allowed $150 attorneys' fees.